MONTGOMERY v. MONTGOMERY'S ESTATE.

1. EXECUTORS AND ADMINISTRATORS — ESTATES OF DECEDENTS — CLAIMS.

Where a son leased his father's farm with the agreement that he was to board and lodge the father and mother, furnish the father his clothes, tobacco, and $50 a year; that he was to care for and feed the stock and work the farm, and in return was to have one-half the increase of the stock and receive all the proceeds of the farm, his labor upon the farm was for his own benefit and did not constitute the basis of a claim against the father's estate.

2. SAME — PERMANENT IMPROVEMENTS — CONTRACTS — CLAIMS — WILLS.

But where the son expended money and labor in erecting a barn and an addition to the house, which enhanced the permanent value of the property, under an agreement that he should be secured in his father's will, the security being intended to be absolute and not subject to the contingency of his dying before his father, his estate was entitled to an allowance against the estate of the father for the cost of the improvements, where the father's will was changed after the son's death, without providing for reimbursement.

3. SAME—APPEAL AND ERROR—INSTRUCTIONS—HARMLESS ERROR— STATUTES.

While it was error for the court to instruct the jury that

recovery might be had for labor of the son in the management of the farm, in addition to the cost of the permanent improvements, it was error without prejudice where the total amount allowed by the jury did not exceed the undisputed value of the permanent improvements, and the provisions of Act No. 89, Pub. Acts 1915, providing that no judgment or verdict shall be set aside unless the error complained of has resulted in a miscarriage of justice, are clearly applicable to sustain the verdict.

Error to Chippewa; Fead, J. Submitted January 17, 1916. (Docket No. 12.) Decided June 1, 1916.

Claim by Florence Montgomery, as administratrix of the estate of Robert Montgomery, Jr., deceased, against the estate of Robert Montgomery, Sr., deceased, for services and for labor and money expended in permanent improvements. The claim was disallowed in the probate court and an appeal taken to the circuit court. Judgment for claimant. Defendant brings error. Affirmed.

*M. M. Larmonth,* for appellant.

*John W. Shine,* for appellee.

This case grows out of a claim presented by the widow of Robert Montgomery, Jr., as the administratrix of his estate, against the estate of his father, Robert Montgomery, Sr. The facts upon which the claim is based are, in substance, as follows:

In 1901, the father leased a farm of 80 acres, owned by him (it seems from the record that he had other lands), to his sons Robert and Samuel. Both were young men still living at home. The lease was for one year, or more, if satisfactory; and for the use of the farm the boys were to furnish the necessaries for the home, board and lodge their father and mother, furnish the father with clothes and tobacco, and pay

him $50 per year. They were also to feed and care for the stock on the place and have one-half of the increase. The farm was worked, under this lease, without any written renewal up to the time of Samuel's death, in 1903. After that Robert continued to work the farm, receive all of the proceeds, and support his father and mother, substantially in accordance with the terms of the lease above mentioned. He seems to have been industrious, an excellent farmer, and very thrifty in his habits. Evidently he was able to accumulate some money for himself from the farm, while at the same time improving its condition. He was the only son living—there were four daughters—and the proofs tend fairly to show an oral agreement that he was to support his father and mother while they lived, and have the farm.

In 1905, or perhaps earlier, the parties—that is, the father and mother and Robert—began to contemplate the building of a barn on the place. The fact that Robert was to put his own money and labor into the building of the barn, while the title to the place still remained in the father, seems to have made it evident to all that he ought to be secured in some way so that the investment would not be lost to him through any mischance. The first idea was to give him a deed of the place outright, and the father went to the judge of probate for the purpose of doing that. But upon the advice of the judge, instead of making a deed, he executed a will devising the land to Robert. The barn, however, was not begun until 1908, when the son did build it, at a cost to himself of from $1,500 to $2,000. The next year he married, and his wife, the present administratrix of his estate, took her place with the family on the farm. Robert continued to manage the farm, have the proceeds, and support the old people, until the spring of 1911, when his health failed, and he found it necessary to look elsewhere for some better

location. With this idea he went West and never returned, dying in Minnesota on March 28, 1912. Before he left, arrangements were made that a man by the name of Trim, who married one of the daughters, should work the place for a couple of years, and pay the father money rent for the same. There seems to be some dispute in the testimony as to whether Trim went on the place at the request of Robert, or by an arrangement wholly with the father. The administratrix of Robert's estate claims that the services of Trim were secured by her husband so that some one might be on the place to look after the parents, and without any idea on the part of her husband or of his parents that the arrangement between them was to be abandoned or suspended. On the other hand, it is claimed in behalf of the father's estate that the arrangement between Robert and his parents was abandoned, and that the lease to Trim was made by the father as superseding the arrangement with the son. This seems to be about the only point regarding which the testimony is contradictory. There is no dispute, however, that, before Robert left on his trip, he built an addition to the house for the convenience of Trim, at a cost of about $200.

Robert, as has been stated, died on March 28, 1912, and almost immediately after his death, viz., on the 4th of April, 1912, the father revoked the will he had previously made, and executed a new one by which the use of this farm was given to his wife, the mother of Robert, for life, with remainder in fee to the four daughters, all of whom are married. There was no provision in the will for Robert's widow, the present administratrix of his estate, and Robert left no children. A little later and on July 14, 1912, the father died.

The only testimony as to the present value of the

farm indicates that it is worth about $6,000 with the buildings upon it. The mother was 74 years of age at the time of the trial in December, 1913.

The claim against the father's estate, as presented by the son's administratrix in the probate court, was for:

| | |
|---|---|
| 10 years' work and labor on the farm of said deceased, at $40 a month.................. | $4,800.00 |
| For money advanced for use of said deceased in building a barn on the Montgomery farm, and for material for the same, 1907, 1908, 1909 .................................... | 2,000.00 |
| To work and labor in building said barn...... | 500.00 |
| To money advanced in building a kitchen to the house ................................. | 200.00 |
| To work and labor on same................. | 100.00 |

In the circuit court a new declaration was filed, describing the nature of the claim somewhat more fully, but making no change in its character. The jury returned a verdict in favor of claimant for $2,068.60.

PERSON, J. (*after stating the facts*). The claim presented against the estate of Robert Montgomery, Sr., consists of two distinct items, or parts, the first for services in managing the farm generally, and the other for money used and labor expended in making permanent improvements on the farm, such as the barn and addition to the house. These subdivisions of the claim must be considered separately.

1. There seems to be no foundation whatever for any allowance in favor of the son's estate because of his general management and cultivation of the farm. The claim in that behalf is not for damages because of the violation of the contract, but for the value of the services, on the ground that they were rendered for, and were beneficial to, the father. The answer is that in working the farm generally the son was not working for his father, but for himself. He managed

the farm as he chose, and received, for his own benefit, all that the land produced. The farm was called the son's, and treated as if the son owned it. It is true he supported his father and mother and gave to the father certain spending money; but his labor upon the farm generally was no more in the nature of service to the father than it would have been had he leased the farm for money rent, and then proceeded to cultivate it for his own benefit. The income which he derived from the farm is not given, nor is the expense of maintaining his father and mother. But the exact figures either way are immaterial; the fact that he cultivated the farm for his own benefit determines the question. That the use of the farm was fairly profitable to him is shown by the money he was able to accumulate therefrom and invest in the permanent improvements hereinafter mentioned.

2. That portion of the claim for money used and labor expended in erecting the barn and building the addition to the house stands upon a different basis. These were permanent improvements which enhanced the value of the property. The money which the son put into these improvements was his own, and so understood by everybody, although it had been obtained through the use of the farm. When it was contemplated that the son would invest his money in permanently improving the land, the title to which was still in the father, it was agreed that he should be secured against losing it. The security was clearly intended to be absolute and not subject to the contingency of his dying before his father did. His right to reimbursement could not be cut off by a change in his father's will. There is no question made but that the value of the land was increased to the full amount of the cost of these improvements; and as much remains to the father's estate after allowing that cost, as there would have been had the improvements not been made. The

son's estate was entitled to an allowance against the estate of his father for the cost of these improvements.

3. The instructions given by the trial court to the jury were not in accordance, fully, with the views above expressed. Those instructions permitted a recovery by the claimant, not only for the money and labor put into the permanent improvements, but also for the services of the son in the general management of the farm, less the value of the proceeds received by him. This was unquestionably erroneous. But it was plainly error without prejudice. The undisputed value of the money and labor put into the permanent improvements by the son, and which his administratrix was entitled to recover, equaled, if it did not exceed, the total amount allowed by the jury. There was practically no dispute in the testimony as to the cost of the improvements, their value to the father's estate, or the understanding with which they were made; and it is fairly probable from the amount of the verdict that it was this portion of the claim which the jury allowed. It is provided by Act No. 89, Pub. Acts 1915 (3 Comp. Laws 1915, § 14565) that:

"No judgment or verdict shall be set aside or reversed, or a new trial be granted by any court of this State in any case, civil or criminal, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless, in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

There can scarcely be a situation where the requirements of this statute are more clearly applicable. The substance of all the evidence taken upon the trial seems to have been included in the bill of exceptions, and the character of the assignments of error made it necessary that this should be so. After an examination of

the entire cause, we cannot say that it affirmatively appears that the errors complained of have resulted in a miscarriage of justice.

The judgment is affirmed.

STONE, C. J., and KUHN, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. OSTRANDER, J., did not sit.